### WIND RIVER MULTIPLE–USE ADVOCATES, a nonprofit corporation, Plaintiff,

v.

### Michael ESPY, Secretary of Agriculture, F. Dale Robertson, Chief of the United States Forest Service; Graye Reynolds, Regional Forester of Region 4 of the United States Forest Service; Brian Stout, Forest Supervisor for the Bridger–Teton National Forest; and The United States Forest Service, Defendants.

No. 92–CV–0296–B.

United States District Court, D. Wyoming.

Oct. 29, 1993.

---

John G. Nelson, Todd S. Welch, Mountain States Legal Foundation, Denver, CO, for plaintiff.

Carol Statkus, Asst. U.S. Atty. Cheyenne, WY (Scott M. Farley, Michael W. Reed, U.S. Dept. of Justice Environment and Natural Resources Div., Washington, DC, on the brief), for defendant.

***ORDER GRANTING DEFENDANTS' MO-
TION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MO-
TION FOR SUMMARY JUDGMENT***

BRIMMER, District Judge.

The above-entitled matter having come before the Court upon the parties' cross-motions for summary judgment, and the Court having reviewed the materials on file herein, having heard argument from the parties, and being fully advised in the premises, FINDS and ORDERS as follows:

### *Background*

The United States Forest Service is administratively empowered to manage and develop lands and resources in the National Forest System. 16 U.S.C. § 1604 (1988). As early as 1979, the Forest Service began to develop alternative management scenarios, analyze the environmental impact of various proposed plans, and incorporate public comment into alternative plans, for the Bridger–Teton National Forest.

Ultimately, on March 2, 1990, the Forest Service adopted the final Bridger–Teton National Forest Land and Resource Management Plan ("the Plan"). Plaintiff, Wind River Multiple Use Advocates ("WRMUA"), then filed an appeal to the Plan. WRMUA principally objected to the Plan because it believes the plan failed to provide for sufficient output of timber and minerals. WRMUA brought this suit alleging that the Forest Service's decision to adopt the Plan gives rise to causes of action under the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 (1988), the Forest and Rangeland Renewable Resources Planning Act ("RPA"), 16 U.S.C. §§ 1600–1614 (1988), and the Multiple–Use Sustained–Yield Act ("MUSYA"), 16 U.S.C. §§ 528–531 (1988). WRMUA claims specifically: (1) the Forest Service failed to complete a thorough survey of the forest's mineral potential which violated the service's own regulations; (2) the forest plan improperly fails to meet the timber harvest objective as required by the na-

tional renewable resources program; and (3) the grizzly bear zones contained in the Plan were established in violation of the statutory requirement for multiple use. Both WRMUA and the defendants have moved for summary judgment.

### Standard of Review

"By its very terms, [the Rule 56(c)] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986) (emphasis in original).

The trial court decides which facts are material as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211; *see also Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir.1987). Summary judgment may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Carey*, 812 F.2d at 623. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Carey*, 812 F.2d at 623. In considering a party's motion for summary judgment, the court must examine all evidence in the light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir.1981).

### Discussion

### A. The Plaintiff's Claims

In urging this Court to invalidate the Bridger–Teton National Forest Land and Resource Management Plan, WRMUA makes three arguments: (1) the Forest Service failed to complete a thorough survey of the forest's mineral potential which violated the service's own regulations; (2) the forest plan improperly fails to meet the timber harvest objective as required by the national renewable resources program; and (3) the forest plan contains special grizzly bear zones which were established in violation of the statutory requirement for multiple use. In order to fully examine the parties' contentions, it will be necessary to understand each of the plaintiff's arguments. The Court therefore first sets forth an overview of each claim.

### 1. The Mineral Survey

The plaintiff's first claim rests on the NFMA, 16 U.S.C. § 1604 (1988), and its accompanying regulations, 36 C.F.R. §§ 219.1–219.27 (1991). The NFMA requires the United States Forest Service ("Forest Service") to survey a forest's mineral potential during the forest planning process. This survey must assess, among other things, the probable occurrence of minerals in the planning area; access requirements for mineral exploration and development; and the probable effect of land management prescriptions on mineral-related activities. 36 C.F.R. § 219.22(c)-(f) (1991).

In performing the mineral survey, the Forest Service relied heavily upon portions of the available literature on mineral occurrence in Wyoming.[1] WRMUA contends that because the Forest Service overlooked some additional literature which indicates that the forest possesses a high potential for hard rock mineral development, and that it failed to conduct a proper minerals survey in violation of the NFMA regulation.

### 2. The Timber Harvest Objective

WRMUA's second claim essentially states that the Average Annual Allowable Sale Quantity ("ASQ") of timber set forth in the plan violates the Renewable Resource Program, 16 U.S.C. § 1602(2) (1988), contained

---

**1.** The Forest service relied upon a comprehensive mineral inventory, mineral occurrence maps, United States Geological Surveys of locatable minerals, articles in geologic trade journals, and reports detailing the mineral occurrence and potential in Wyoming national forests.

in the RPA, 16 U.S.C. §§ 1600–1614 (1988), and the NFMA. The RPA directs the Secretary of Agriculture to prepare an assessment of the Nation's renewable resources every ten years. 16 U.S.C. § 1601 (1988). This assessment serves as a basis for the program recommended to Congress by the President which contemplates resource output goals and objectives nationwide. 16 U.S.C. § 1602 (1988). At the regional level, the RPA directs each of the Regional Foresters to prepare Regional Guides which incorporate the resource goals and objectives set forth in the national program. 36 C.F.R. § 219.4(b)(2) (1991). The Regional Guides must "display tentative resource objectives for each Forest from the RPA program." *Id.*

The Bridger–Teton National Forest's timber harvest objective was set at 46 million board feet per year. *See* United States Forest Service, *Bridger–Teton Nat'l Forest Final Envtl. Impact Statement.* The plan, however, sets the ASQ for timber at approximately 12 million board feet per year. WRMUA claims that the RPA harvest objective is binding upon the forest Service and as a result, the plan's designation is in violation of the RPA and the NFMA.

### 3. The Grizzly Bear Zones

WRMUA's final contention is that the plan's incorporation of the Interagency Grizzly Bear Guidelines ("Grizzly Bear Guidelines") violated the MUSYA, 16 U.S.C. §§ 528–531 (1988), and the NFMA requirements that the forest be managed for multiple use.[2] Generally, the MUSYA requires the Forest Service to consider multiple use in

its administration of the national forests. 16 U.S.C. § 529.

The Forest Service adopted the Grizzly Bear Guidelines when it designated certain areas of the forest as "Management Situation Two" and "Management Situation Three" ("MS–2" and "MS–3"). In essence, MS–2 areas are defined as areas where grizzly bears are occasionally found. In MS–2 areas, where grizzly bears and a proposed use are mutually exclusive, the other uses may prevail. MS–3 areas are defined as those areas where many people are found, and as a result, grizzly bears may be attracted to the area. In those areas, the maintenance and improvement of grizzly habitat is not considered a factor in forest management, and in fact, the goal in these areas is to discourage the presence of bears to prevent human conflict.

WRMUA's argument is that in adopting the Grizzly Bear Guidelines, the Forest Service relied solely upon biological criteria, failing to weigh any multiple use alternatives against grizzly use. This, claims WRMUA, violated the MUSYA.

### B. The Defendants' Motion for Summary Judgment

Having set out a general description of each of the plaintiff's claims, the Court next turns to the defendants' motion for summary judgment. The defendants make two arguments in support of their motion: (1) that the plaintiff does not have standing to bring this suit; and that even if it does, (2) this Court cannot invalidate the plan under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) (1988).[3] The Court addresses each argument below.

---

**2.** In this context "multiple use" means:
   The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resource; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various re-

sources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.
   *Id.* § 531.

**3.** The APA states, "The reviewing court shall ... hold unlawful and set aside any agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). Accordingly, this Court construes the defendants' arguments that the Forest Service's actions were not arbitrary and capricious and that the Forest Service complied with the law as asserting essentially the same argument, namely, that under the scope of review

### 1. The Doctrine of Standing

#### a. Background on the Law of Standing

Article III of the Constitution limits the jurisdiction of the federal courts to actual "cases" and "controversies." U.S. CONST. art. III, § 2. This limitation on the federal judicial power requires, that a litigant have "standing" before he may invoke a court's power. As the Supreme Court has stated, "[i]n essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). Thus, the doctrine of standing focuses a court's attention on the party seeking to invoke the court's jurisdiction, and not the underlying issues that the party seeks to raise on the merits. *United States v. Richardson*, 418 U.S. 166, 174, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678, —— (1974) (citing *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961 (1968)).

The doctrine of standing consists of both constitutional components, stemming from the Article III case or controversy requirement, as well as several judicially self-imposed, or prudential, components. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556, 569–70 (1984). Standing, like the other doctrines that center around Article III, relates to an idea "which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." *Id.*, at 750, 104 S.Ct. at 3324, 82 L.Ed.2d at 569 (citing *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C.Cir.1983) (Bork, J., concurring)).

At a minimum, the constitutional component of standing requires a litigant to demonstrate three things:

First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally-protected interest which is (a) concrete and particularized, *see* [*Allen v. Wright*, 468 U.S. 737, 756, 104 S.Ct. 3315, 3327, 82 L.Ed.2d 556 (1984); *Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740–41, n. 16, 92 S.Ct. 1361, 1368–69, n. 16, 31 L.Ed.2d 636 (1972) ] and (b) 'actual or imminent, not "conjectural" or "hypothetical" ' [*Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983)) ]. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42[, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450] . . . (1976). Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' *Id.* at 38[, 43, 96 S.Ct. at 1924, 1926].

*Lujan v. Defenders of Wildlife*, —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). In describing the requisite injury as "particularized," the Supreme Court explained that it meant "that the injury must affect the plaintiff in a personal and individual way." *Id.*, at —— n. 1, 112 S.Ct. at 2136 n. 1, 119 L.Ed.2d at 364 n. 1.

In addition to the constitutional components, the Supreme Court has fashioned several prudential considerations that would justify denying standing under certain circumstances. Those judicially-created, non-constitutional considerations are a general prohibition against asserting the rights of third parties, the rule barring adjudications of "generalized grievances" more properly redressed through the political branches of government, and the requirement that the plaintiff's complaint fall within the "zone of interests" protected by the law. *See Allen*, 468 U.S. at 751, 104 S.Ct. at 3324, 82 L.Ed.2d at 569 (citations omitted).

Thus, the Supreme Court's cases on the subject of standing make it clear that an individual litigant needs to have a proper stake in the outcome of a controversy before he may properly invoke a federal court's

provided in the APA, this Court cannot invalidate the Forest Service's actions.

jurisdiction. When, however, the plaintiff challenges an agency action under the APA, the plaintiff must also satisfy special standing requirements applicable to administrative claims. In order to have standing under the APA, 5 U.S.C. § 702, a person must meet two requirements: first, the person claiming a right to sue must identify some final agency action that has injured him, and, second, the injury complained of must fall within the "zone of interests" to be protected by the statute at issue. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 882–83, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695, 712–13 (1990); *Western Shoshone Business Council v. Babbitt,* 1 F.3d 1052, 1055 (10th Cir.1993).

When a party alleges a lack of standing in a motion for summary judgment, "the burden is on the party seeking review under [the APA] to set forth specific facts showing" that he has established the requisite standing. *Id.,* 497 U.S. at 884, 110 S.Ct. at 3187, 111 L.Ed.2d at 714. The plaintiff, therefore, "can no longer rest on [the] 'mere allegations' [contained in its complaint], but must 'set forth' by affidavit or other evidence 'specific facts,' Fed Rule Civ Proc 56(e) (sic), which for purposes of summary judgment will be taken to be true." *Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 365.

With these principles in mind, this Court is now faced with the difficult task of applying them to the case at bar.

### b. Application of Law of Standing to This Case

After a thorough review of the record in this case, the Court has concluded that the plaintiff has failed to meet its burden of demonstrating that it is suffering from any real injury, and therefore, this Court is forced to conclude that the plaintiff has no standing to sue in this case.

To establish the injury in fact element of standing, the plaintiff must show "an invasion of a legally-protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not 'conjectural' or 'hypothetical' " in nature. *Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (citations omitted). WRMUA makes specific allegations of harm which correspond to each of its claims.

First, the plaintiff contends that the defendants' "failure [to conduct a proper minerals survey] has harmed, and will continue to harm, [WRMUA] and its members by reducing access to potentially valuable mineral deposits in the Bridger–Teton National Forest." In support of this allegation, the plaintiff has submitted the affidavit of Mr. William King who is a geologist intending to engage in mineral exploration in the forest. The plaintiff reasons that if the Forest Service had performed an adequate minerals survey, the Plan would have contained fewer restrictions and requirements in the development of mining claims, and, consequently, it would have been easier to develop claims. The WRMUA concludes, therefore, that because the Plan makes it more difficult to develop claims, the Plan has caused WRMUA members economic injury. The Court finds this argument unpersuasive.

The 1872 Mining Law, 30 U.S.C. § 22 (1988), provides the right to mine in national forests. *See* 16 U.S.C. § 478 (1988) (providing "nothing [in selected sections of this title] shall prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof"); *see also United States v. Mobley,* 45 F.Supp. 407, 408–09 (S.D.Cal.1942) (applying the statute). Indeed, the Plan makes this clear: "All lands will be available for locatable mineral entry except those which have been protected by notation or administratively withdrawn." *Forest Plan* at 134. Therefore, there is a "legally-protected interest" upon which standing may be based. *See Defenders of Wildlife,* —— U.S. at ——, 112 S.Ct. at 2136, 119 L.Ed.2d at 364. The plaintiff, however, has not shown how its access to the forest for exploration, or development of mineral resources located there, has been harmed by the Plan or the Forest Service's alleged failure to perform an adequate minerals survey of the area. Therefore, the Court holds that the plaintiff has no standing with respect to this claim.

Second, the WRMUA claims that the defendants' "failure to meet the RPA timber harvest objective has harmed, and will con-

tinue to harm, [the WRMUA and its] members by reducing the availability of timber from the Bridger–Teton National Forest to less than one-third of what it otherwise would have been." In support of its contention, WRMUA submitted the affidavit, of Mr. Patrick Hickerson, a WRMUA member whose timber mill obtains timber from logging in the forest. The plaintiff reasons, as it did with respect to the alleged harm suffered by the mining survey, that the Plan has caused its members economic injury by subjecting them to more restrictions and making less timber available than there would have been if the Plan had complied with the RPA objective.

To show the requisite injury to establish standing, the plaintiff must show that it has a "legally-protected interest," *id.*, at —, 112 S.Ct. at 2136, 119 L.Ed.2d at 364, in harvesting timber in the future. The plaintiff has failed to make this showing. In a previous challenge to reductions in timber projections for the Bridger–Teton National Forest, this Court held that no statute or regulation confers the right to harvest timber in the forest. *Intermountain Forest Indus. Ass'n v. Lyng,* 683 F.Supp. 1330, 1340 (D.Wyo.1988); *see also Region 8 Forest Serv. Timber Purchasers Council v. Alcock,* 993 F.2d 800, 808 (11th Cir.1993) (stating "the Council and the Timber Companies have no right to compel the Forest Service to sell any future timber to them"). Therefore, the Court concludes that WRMUA has no standing with respect to its RPA claim.

■ Finally, WRMUA maintains that the adoption of the Grizzly Bear Guidelines "has harmed and will continue to harm, [the WRMUA and its] members by placing many restrictions on human activities in the Bridger–Teton National Forest, including logging, mining, grazing and recreation." The plaintiff contends that because the Grizzly Bear Guidelines restrict human activities which might conflict with grizzly bears in MS–1 and MS–2 areas, they reduce the amount of logging, mineral development, and other activities available in the forest, and thus cause economic harm to its members.

Here, again, the plaintiff has failed to demonstrate how the Plan's adoption of the Grizzly Bear Guidelines has resulted in a judicially cognizable injury. In *Defenders of Wildlife,* — U.S. at — n. 1, 112 S.Ct. at 2136 n. 1, 119 L.Ed.2d at 364 n. 1, the Supreme Court explained that "the injury must affect the plaintiff in a personal and individual way." The plaintiff has failed to make this showing. In fact, in this claim, the plaintiff makes merely a generalized grievance, alleging nothing beyond the common interest shared by all citizens with respect to use of the forest. *See Allen,* 468 U.S. at 754, 106 S.Ct. at 3326, 82 L.Ed.2d at 569 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State Inc.,* 454 U.S. 464, 482, 102 S.Ct. 752, 764, 70 L.Ed.2d 700, 716 (1982); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208 at 223 n. 13, 94 S.Ct. 2925, 2933 n. 13, 41 L.Ed.2d 706, — n. 13 (1974)).

Moreover, this Court observes that even if there was a sufficient injury in fact, the plaintiff has not established the redressability component of the standing inquiry with respect to this claim. The redressability component of standing requires that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Defenders of Wildlife,* — U.S. at —, 112 S.Ct. at 2136, 119 L.Ed.2d at 364 (citing *Simon,* 426 U.S. at 38, 96 S.Ct. at 1924, 48 L.Ed.2d at 460). The relief that the plaintiff seeks with respect to this claim is the deletion of the Grizzly Bear Guideline management prescriptions from the Plan. However, even if the Court were to order such relief, the defendants would still be required to comply with the Endangered Species Act of 1973, 16 U.S.C. § 1531 et seq. (1988) to ensure the protection of the grizzly bear. It would constitute pure speculation by this Court to accept WRMUA's claim that such compliance would allow the removal of restrictions on human activity while, at the same time, providing protection for the bears. Therefore, because WRMUA has shown neither sufficient injury nor redressability, this Court concludes that the plaintiff has no standing with respect to this claim.[4]

---

4. The defendant also argues that, with respect to

its Grizzly Bear Guidelines claim, the WRMUA

## 2. The Forest Service's Compliance with the APA

In the alternative, the defendants argue that even if the WRMUA had standing to bring its claims, it has not shown that the Forest Service's implementation of the Plan was arbitrary and capricious, such that this Court should grant any relief. The Court next turns to this argument.

### a. Standard of Review

Both parties agree that the appropriate standard for judicial review of the Forest Service's action is the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) & (C) (1988). *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443, 456–57 (1983); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136, 152 (1971).

■ It is well-established that this standard is one of deference, and that the party claiming that the action was arbitrary and capricious must overcome a significant hurdle. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2867, 77 L.Ed.2d at 458. "All the agency need do is demonstrate it considered relevant factors and alternatives after a full ventilation of the issues, and that the choice[s] it made [were] reasonable based on these considerations." *Thomas Brooks Chartered v. Burnett,* 920 F.2d 634, 643 (10th Cir.1990) (citing *American Mining Congress v. Marshall,* 671 F.2d 1251, 1255 (10th Cir. 1982)). Further, this Court "is not empowered to substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153. Its task is simply to determine whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.; Gallegos v. Lyng,* 891 F.2d 788, 790 (10th Cir.1989). The Court's review of the agency action is limited to the record before the agency at the time the agency made its decision. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106, 111 (1973).

■ Moreover, when reviewing an agency's interpretation of a statutory scheme that the agency is authorized to implement, courts will defer to the agency's interpretation. *See Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 852, 104 S.Ct. 2778, 2786, 81 L.Ed.2d 694, 708–09 (1984). This is particularly true where the agency interpretation regards matters in which the agency has expertise because the interpretation of vague or ambiguous statutory language is often more a question of policy than law. *Pauley v. Beth-energy Mines,* —— U.S. ——, ——, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604, 624 (1991).

Because this case comes to this Court on cross-motions for summary judgment, this Court must assess the record under the standard set forth in Fed.R.Civ.P. 56(c), discussed above. The Rule 56(c) standard is "fully applicable when a defendant moves for summary judgment in a suit brought under § 702 [of the APA].... The burden is on the party seeking review under § 702 to set forth specific facts (even though they may be controverted by the Government) showing that he has satisfied its terms." *National Wildlife Fed'n,* 497 U.S. at 884, 110 S.Ct. at 3186, 111 L.Ed.2d at 714 (citing *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Therefore, the plaintiff must show that there is a genuine issue of material fact that the Forest Service's actions were arbitrary and capricious in order to survive the defendants' motion for summary judgment.

### b. The Forest Service's Conduct

#### i. The Minerals Survey

■ In its first claim, WRMUA alleges that the Forest Service failed to properly assess the probable occurrence of "hard rock" minerals, contrary to the NFMA planning regulations. 36 C.F.R. § 219.22 (1991). This Court has concluded that WRMUA has failed to demonstrate the existence of any genuine issues of material fact that the Forest Service's mineral evaluation was arbitrary and capricious.

---

has failed to exhaust its administrative remedies and thus this Court has no jurisdiction over this claim. This Court need not address this conten-

tion, because it has concluded that there is no jurisdiction based on the fact that the plaintiff lacks standing.

With respect to the obligation to consider "locatable" or "hard rock" minerals in the planning process, the regulations provide:

> Mineral exploration and development in the planning area shall be considered in the management of renewable resources. The following shall be recognized to the extent practicable in forest planning:
>
> .    .    .    .    .
>
> (c) the probable occurrence of various minerals, including locatable, leasable, and common variety;
>
> (d) the potential for future mineral development and potential need for withdrawal of areas from development....

36 C.F.R. §§ 219.22(c)-(d) (1991). The words "considered" and "to the extent practicable" vest broad discretion in the Forest Service's evaluation of the mineral potential in forest planning. Examination of the administrative record reveals that the Forest Service complied with the procedural obligation created by this regulation.[5]

Historically, there has been little or no exploration and development of hard rock minerals on the Bridger–Teton National Forest and, at the time of the adoption of the Plan, no mining operations existed in the forest. Nevertheless, the Forest Service complied with the regulation, surveying the probable occurrence of locatable minerals and estimating their potential for future development. The Plan explains that "oil and gas, phosphate, geothermal, coal, copper and silver, uranium and vanadium, gold and titanium, sand and gravel, molybdenum, bentonite and pumice, and iron" are "mineral commodities" found in the forest. *Forest Plan* at 44. The Plan also addresses the future development of locatable minerals in the forest. It notes, for example, that river beds provide good sources for sand and gravel as well as gold and that demand for these commodities is on the rise. *Id.* at 65. Further, the Bridger–Teton Environmental Impact Statement provides a very detailed examination of mineral occurrence in the area.

In short, there is no genuine issue of material fact that the Forest Service's consideration of locatable minerals was not arbitrary and capricious. WRMUA's first cause of action presents a mere disagreement with the manner in which the minerals survey was performed and the conclusions the Forest Service reached. This Court, however, cannot substitute its judgment (or the judgment of WRMUA) for that of the Forest Service, particularly in view of the discretion granted by the regulation at issue and the expertise of the Forest Service in this area. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377, 395 (1989) (stating "[w]hen specialists express competing views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive").

### ii.  The Timber Output Objective

■ In its second cause of action, WRMUA urges this Court to accept the proposition that the regulations implementing the RPA, as amended by the NFMA, compelled local forest planners at the Bridger–Teton National Forest to incorporate the RPA program tentative resource objective as the Plan's ASQ. This interpretation of the RPA contravenes the plain language of the act as well as the Forest Service's interpretation.

The RPA regulations direct the Regional Foresters to prepare regional guides which reflect the resource goals and objectives set forth in the RPA program. 36 C.F.R. § 219.4(b)(2) (1991). These guides must "display *tentative* resource objectives for each Forest." *Id.* (emphasis added). Yet, nowhere do the regulations compel local forest planning to reflect these objectives. In fact, the regulations merely require that a "range of resource objectives[,] ... including at least one alternative which responds to and incorporates the tentative RPA Program resource objectives displayed in the regional

---

**5.** The Plan's summary of locatable mineral occurrences in the Forest and predictions as to potential future development were based on documentation in the administrative record which included: a comprehensive mineral inventory, mineral occurrence maps, United States Geological Survey mineral surveys, geology trade journal articles and reports detailing mineral potential in Wyoming.

guide," be evaluated. 36 C.F.R. § 219.4(b)(3) (1991). The Forest Service must "explain the relationship of expected outputs [of alternatives which deviate from the objectives] to the RPA tentative resource objectives." *Id.* § 219.12(g)(2) (1991). Finally, the Regional Forester, who is charged with approval of each individual forest plan, "may [in his approval of plans that deviate from the RPA objectives] incorporate adjustment of the tentative RPA Program objectives displayed in the regional guide" to reflect the individual plan's deviation from the objectives. *Id.* § 219.4(b)(3).

This language indicates that the incorporation of the RPA objectives in the forest plan is anything but mandatory, as WRMUA suggests. The RPA merely requires the Forest Service to formulate and evaluate an "alternative" management scenario which incorporates the RPA objectives in its local planning process.[6] Here, the Forest Service complied with this procedural requirement in its formulation and evaluation of "alternative B," the RPA alternative in the Bridger–Teton Environmental Impact Statement. In addition, the Forest Service detailed its reasons for adopting "alternative F" in the Forest plan in its Rule of Decision. Therefore, this Court concludes that there is no genuine issue of material fact whether the Forest Service decision to provide an ASQ of approximately 12 million board-feet of timber per year in the Plan was arbitrary and capricious. Summary judgment in favor of the defendants is therefore warranted.

### iii. The Grizzly Bear Guidelines

■ In its final claim for relief, WRMUA argues that the adoption of the Grizzly Bear Guidelines allowed for no consideration of multiple use and thus violated the MUSYA and NFMA. The defendants explain that the Forest Service incorporated the Grizzly Bear Guidelines in an effort to comply with the Endangered Species Act. That law creates a substantive mandate that the Forest Service, in the course of land planning and management, not jeopardize, take or impede the recovery of the Grizzly Bear. The adoption of the guidelines, however, does not preclude multiple use of resources in the forest. In fact, those areas designated as MS–1, MS–2 or MS–3 are open to multiple uses, including timber harvest and mineral production. *See Forest Plan* at 146–51, 207–11.

Moreover, the MUSYA does not contemplate that every acre of National Forest be managed for every multiple use. Congress recognized "that some land will be used for less than all of the resources." 16 U.S.C. § 531 (1988). Courts that have considered this issue have held that the MUSYA grants the Forest Service "wide discretion to weigh and decide the proper uses within any area." *Bighole Ranchers Ass'n v. United States Forest Serv.,* 686 F.Supp. 256, 264 (D.Mont. 1988); *see also Perkins v. Bergland,* 608 F.2d 803, 806 (9th Cir.1979) (the MUSYA " 'breathes discretion at every pore' ") (quoting *Strickland v. Morton,* 519 F.2d 467, 469 (9th Cir.1975)).

The touchstone of the MUSYA is that the Forest Service must give "due consideration" to the competing uses in the overall planning effort. *Sierra Club v. Hardin,* 325 F.Supp. 99, 123 (D.Alaska 1971). "Due consideration" under the act does not mean equal consideration. *Id.* Indeed, since "Congress has given no indication as to the weight to be assigned each value, . . . it must be assumed that the decision as to the proper mix of uses within any particular area is left to the sound discretion of the Forest Service." *Id.* Generally, as long as "the Forest Service considers the other competing uses, the courts are reluctant to overrule its decisions." *National Wildlife Fed'n v. United States Forest*

---

6. Moreover, it is well-established in the Tenth Circuit that an "agency's administrative interpretation of its own regulations must be given controlling weight unless it is plainly inconsistent with the regulations." *City of Aurora v. Hunt,* 749 F.2d 1457, 1462 (10th Cir.1984) (citing *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945); *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48, 56

(1972)); *see also Downtown Medical Center v. Bowen,* 944 F.2d 756, 768 (10th cir.1991); *Davis v. OWC U.S. Dept. of Labor,* 936 F.2d 1111, 1115–16 (10th Cir.1991). In this case, the agency's interpretation of its regulations and its conclusion that instead of mandating "top down" management, they allow for local flexibility and planning, is clearly consistent with the plain language. This Court, therefore, gives the Forest Service's interpretation deference.

*Serv.,* 592 F.Supp. 931, 938 (D.Or.1984), *appeal dismissed,* 801 F.2d 360 (9th Cir.1986).

In this case, the administrative record is replete with the Forest Service's consideration of multiple use. *See generally, Forest Plan, Environmental Impact Statement, Rule of Decision.* All of the alternatives analyzed by the Forest Service provided varying degrees of production of every multiple use resource. Additionally, as explained above, multiple use activities, like commodity production and recreation, are not prohibited in Grizzly Bear management situations. The mere fact that the Forest Service set aside land to be primarily managed as Grizzly Bear habitat does not obscure the fact that the Forest Service considered other multiple uses in the planning process or in the final forest plan. Therefore, the Court concludes that there is no genuine issue of material fact whether the Forest Service acted arbitrarily and capriciously in incorporating the Grizzly Bear Guidelines into the Plan and accordingly grants the defendants' motion for summary judgment.

THEREFORE, IT IS

**ORDERED** that the defendants' Motion for Summary Judgment be, and the same hereby is, **GRANTED.** It is further

**ORDERED** that the plaintiff's Motion for Summary Judgment be, and the same hereby is, **DENIED.**