**WYOMING TIMBER INDUSTRY ASSOCIATION, a Wyoming non-profit trade association; Frontiers of Freedom–Wyoming, a Wyoming non-profit organization, Petitioners,**

v.

**UNITED STATES FOREST SERVICE; Daniel R. Glickman, in his official capacity as Secretary of the United States Department of Agriculture; Michael P. Dombeck, in his official capacity as Chief Forester of the United States Forest Service; Lyle Laverty, in his official capacity as Regional Forester, Region II, United States Forest Service; Jack A. Blackwell, in his official capacity as Regional Forester, Region IV, United States Forest Service, Respondents,**

Wyoming Outdoor Council, Bighorn Forest Users Coalition, Sierra Club, Wilderness Society, Greater Yellowstone Coalition, Northwest Wyoming Resource Council, Biodiversity Associates, Wyoming Wilderness Associa-

tion, Wyoming Wildlife Association, American Wildlands, American Lands Alliance, Pacific Rivers Council, Oregon Natural Resources Council, U.S. Public Interest Research Group, Intervenor Respondents, and

Northwest Forestry Association, Independent Forest Products Association, Intermountain Forestry Association, California Forestry Association, Amici Curiae.

No. 99–CV–1016–B.

United States District Court,
D. Wyoming.

Jan. 5, 2000.

John D. Ward, Sheridan, WY, for petitioners.

Carol A. Statkus, AUSA, U.S. Attorney's Office, Cheyenne, WY, John W. Watts, Dept. of Justice, Washington, D.C., for federal defendants.

James S. Angell, Stephen D. Mashuda, Earthjustice Legal Defense Fund, Bozeman, MT, Caroline Byrd, Lander, WY, for intervenor respondents.

Scott W. Horngren, Portland, OR, John A. Coppede, Cheyenne, WY, for Amici Curiae.

## ORDER

BRIMMER, District Judge.

This matter comes before the Court on Petitioners' petition for review of the United States Forest Service's final interim rule, codified as 36 C.F.R. § 212.13, requiring an eighteen month suspension of road construction decision making in certain unroaded areas within the National Forest System (the "Rule").[1] After hearing oral arguments, reading the briefs, and being fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:

---

1. Petitioners divide their complaint into two bases for relief: (1) First Amended Complaint for Declaratory Judgment and Injunctive Relief; and (2) Petition for Review. (Pet'nrs' First Am.Compl. at 2, 8.) Because neither the Wyoming Wilderness Act, the National Forest Management Act, nor the National Environmental Policy Act provide for judicial review of Forest Service actions, Petitioners must rely on the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, as the basis for judicial review. Actions for declaratory judgment or injunctive relief are appropriate forms of legal action when seeking judicial review under the APA. See 5 U.S.C.A. § 703 (West 1996). These forms of action, however, are not separate grounds for judicial review of agency action, but are merely vehicles for bringing an action for judicial review. Consequently, Petitioners' declaratory judgment and injunctive relief action is not a separate cause of action, and Petitioners' complaint will be treated, in its entirety, as a petition for judicial review pursuant to 5 U.S.C. § 702. Under *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1579–80 (10th Cir.1994), the Court must function in an appellate capacity rather than as a trial court when reviewing agency action.

### Background

Today's dispute is part of the larger battle over the use of our public lands. In particular, the dispute over the Rule arises out of the struggle over wilderness designation within the National Forest System. Consequently, a brief review of the wilderness designation controversy will serve to frame the issues which form the backdrop to the present lawsuit.

The debate over wilderness designation has centered on roadless and undeveloped areas within the National Forest System, which are thought to be most suitable for wilderness designation. In 1977, the United States Forest Service ("Forest Service") instituted its second Roadless Area Review and Evaluation ("RARE II") which sought to survey roadless areas within the National Forests to determine which areas would be appropriate for congressional addition to the National Wilderness Preservation System. *See* S.Sep. No. 98–54, at 3 (1983). The State of California succeeded in a suit claiming that the RARE II Final Environmental Impact Statement ("EIS") inadequately considered the wilderness alternative for a number of areas located within California. *California v. Bergland*, 483 F.Supp. 465 (E.D.Cal.1980), *aff'd in part, rev'd in part, sub nom, California v. Block*, 690 F.2d 753 (9th Cir.1982).

Concurrently with the RARE II study, the Forest Service was conducting a land management planning process mandated by the National Forest Management Act of 1976 ("NFMA"). *See* S.Rep. No. 98–54, at 3–4. The planning process requires the Forest Service to allocate lands among a variety of different uses. *See* 16 U.S.C.A. § 1604(e) (West 1985). The Forest Service was to consider the option of recommending that Congress designate appropriate areas as wilderness. NFMA mandated completion of the first round of the planning process by September 30, 1985. *See* 16 U.S.C.A. § 1604(c). These first round plans are referred to as "first generation" or "section 6" plans. Second generation forest plans must be completed within ten to fifteen years after the first generation plans.

Those in the West who rely on National Forest lands for their livelihood were dissatisfied with the status of National Forest management in general and the wilderness designation debate in particular. Economic users of the National Forests were concerned that endless debate and study surrounding the wilderness issue was obstructing appropriate economic utilization of National Forest lands. *See* S.Rep. No. 98–54, at 12–15. They feared that even lands not designated as wilderness would be managed in a perpetual defacto wilderness state pending additional studies and potential future wilderness designation. *See id.* Moreover, the possibility of litigation challenging EIS's covering forest planning decisions created an additional layer of uncertainty. *See id.*

### 1. The Wyoming Wilderness Act of 1984

Many Western states, including Wyoming, sought a final Congressional solution to the wilderness debate for National Forest lands within their borders. Congress responded with the Wyoming Wilderness Act of 1984 (the "WWA"), Pub.L. No. 98–550, 98 Stat. 2807 (1984). The purposes of the WWA were to designate certain National Forest Service System lands in Wyoming for inclusion in the National Wilderness Preservation System, and also to "insure that certain National Forest System lands in the State of Wyoming be made available for uses other than wilderness in accordance with applicable national forest laws and planning procedures and the provisions of this Act." Pub.L. No. 98–550, § 102(b), 98 Stat. 2807.

Title II of the WWA (§§ 201 through 203) designates certain National Forest System lands as wilderness. Title III (§ 301) designates certain wilderness study areas which are to be considered for wilderness designation when the second generation forest management plans are prepared. Most important to this dispute,

Title IV (§ 401) of the WWA releases remaining lands for multiple use management. Specifically, the WWA provides that RARE II lands not designated as wilderness or wilderness study area

> shall be managed for multiple use in accordance with land management plans pursuant to section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974 as amended by the National Forest Management Act of 1976: *Provided,* That such areas need not be managed for the purpose of protecting their suitability for wilderness designation prior to or during revision of the initial land management plans.

Pub.L. No. 98–550, § 401(b)(3), 98 Stat. 2812. Title V of the WWA contains various miscellaneous provisions, most notably § 504, which provides:

> Congress does not intend that the designation of wilderness areas in the State of Wyoming lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from within any wilderness area shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area.

Pub.L. No. 98–550, § 504, 98 Stat. 2813.

**2. The Forest Service's Temporary Suspension of Road Construction in Unroaded Areas (the Rule)**

Separate and apart from the WWA, the Forest Service was growing increasingly concerned about the ecological and resource impacts of roads within the National Forest System. *See* 63 Fed.Reg. 4350 (1998). In particular, the Forest Service was concerned with funding shortfalls, erosion and other environmental damage, substandard roads, and the value of unroaded areas. *See id.* at 4350–51. In light of these concerns, the Forest Service believed that new analytical tools were needed to assess the benefits and impacts of roads. *See* 63 Fed.Reg. 9980, 9981 (1998). On February 12, 1999, the Forest Service issued a final interim rule (the "Rule"), which temporarily suspends, for an 18–month period beginning March 1, 1999, project decision making regarding road construction and reconstruction in many unroaded areas of the National Forest System. *See* 64 Fed.Reg. 7290 (1999) (codified at 36 C.F.R. § 212.13). In particular, the Rule suspends road construction and reconstruction projects in: (a) all remaining RARE II roadless areas and all unroaded roadless areas identified in forest plans which are one-quarter mile or more beyond an existing classified road; (b) all unroaded areas greater than 1,000 acres that are contiguous to unroaded RARE II areas and unroaded areas identified in forest plans; (c) certain Appalachian areas; (d) all unroaded areas greater than 1,000 acres that are contiguous to Congressionally designated wilderness areas or National Wild and Scenic River System areas classified as Wild; and (e) all unroaded areas greater than 1,000 acres that are contiguous to other unroaded areas of 5,000 acres or more on federal lands. *See* 36 C.F.R. § 212.13.

The Rule also contains several exceptions. For example, the Rule does not apply to lands covered by a forest plan which was finalized after January 1, 1996. The Rule also exempts "unroaded areas where roads are needed for public safety, needed to ensure access provided by statute, treaty, or pursuant to reserved or outstanding rights; or needed to address an imminent threat of flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property." 36 C.F.R. § 212.13(c).

**3. The Lawsuit**

Petitioner Wyoming Timber Industry Association ("WTIA") is a non-profit trade association whose membership is comprised of nineteen primary and secondary timber processing companies. (Pet'nrs' First Am.Compl. ¶ 2.) Petitioner Frontiers of Freedom–Wyoming is a subsidiary of Frontiers of Freedom, a non-profit corporation formed "for purposes of, inter alia, education, research, advising and monitor-

ing governmental activity for its members and the general public." (*Id.* ¶ 4.) In their petition for judicial review of the Rule, Petitioners seek a declaratory judgment that the Rule is contrary to law as well as an injunction against enforcement of the Rule.

The cornerstone of Petitioners' argument is that the Rule violates the WWA. (Pet'nrs' Br. at 2–20.) In Petitioners' view, the Rule is inconsistent with the multiple use mandate of the WWA for released lands because the Rule results in a defacto wilderness management state for roadless areas. (*Id.* at 14–18.) Petitioners also argue that the WWA requires the Forest Service to follow the NFMA's forest planning procedures in order to enact a temporary road construction moratorium. (Pet'nrs' Reply Br. at 16–17.) Thus, according to Petitioners, the Forest Service's promulgation of the Rule under the APA's informal rulemaking procedures violated the WWA. (*Id.*) Petitioners also contend that the Rule violates the WWA's provision that the WWA was not intended to create buffer zones around designated wilderness areas. (Pet'nrs' Br. at 19–20.) Finally, Petitioners argue that the Forest Service violated the National Environmental Policy Act of 1969 ("NEPA") in promulgating the Rule. (*Id.* at 28–32.)

Respondents contend that Petitioners lack standing to bring this lawsuit, primarily because Petitioners did not sustain a redressable injury. (Federal Resp.Br. at 12–18.) From Respondents' perspective, the lost opportunity to bid on future timber sales is speculative and not redressable because the Court cannot order that specific sales take place or that any of the Petitioners' members receive a timber contract. (*Id.* at 15–18.) According to Respondents, the Rule fully complies with the WWA. (*Id.* at 18–33.) Further, Respondents contend that the Forest Service was within its discretion to enact the road moratorium via APA rulemaking in lieu of modifying each forest plan under NFMA forest planning protocols. (*Id.* at 34–36.) Respondents assert that the Forest Service fully complied with NEPA by completing an Environmental Assessment ("EA") and appropriately issuing a Finding of No Significant Impact ("FONSI"). (*Id.* at 40–51.)

### Analysis

Before the Court can reach the merits of Petitioners' claims, it must first address the "threshold jurisdictional question" of whether Petitioners have standing to sue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). The constitutional standing requirement derives from Article III's limitation on the federal judicial power to adjudication of "cases" or "controversies." *Id.;* U.S. Const. Art. III, § 2. The Article III standing requirement, ensures that the domain of the courts is limited to justiciable cases, and effectuates the Constitution's separation of powers function by preventing courts from engaging in activities more appropriately performed by legislatures or executives. *See Steel Co.*, 523 U.S. at 102, 118 S.Ct. 1003. "Standing to invoke the power of the federal courts is not a mere technical hoop through which every plaintiff must pass, but rather is 'a part of the basic charter promulgated by the Framers of the Constitution.'" *Utah v. Babbitt*, 137 F.3d 1193, 1202 (10th Cir. 1998) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 476, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). In light of the constitutional gravity of the standing requirements, "the assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

The "irreducible constitutional minimum of standing" consists of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete

and particularized, (b) actual or imminent, not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision. *Id.* at 560–61, 112 S.Ct. 2130 (internal quotations and citations omitted).

Aside from Article III standing requirements, there are additional prudential limits on standing. *See Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1451 (10th Cir. 1994). First, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Second, even where the plaintiff has met the constitutional standing requirements, courts should "refrain[ ] from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge,* 454 U.S. at 475, 102 S.Ct. 752 (quoting *Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. 2197). Finally, the plaintiff's complaint must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

" '[S]tanding jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief.' " *Wyoming ex rel. Sullivan v. Lujan,* 969 F.2d 877, 882 (10th Cir.1992) (quoting *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 703–04 (D.C.Cir.1988)). Here, while Petitioners' allegations of injury are hardly "precise," it can be gleaned from the briefs and oral argument that Petitioners allege economic injuries to their timber company members caused by delay or reduction in timber sales resulting from the Rule. Declarations of WTIA's members' employees indicate that Petitioners also claim that these employees will suffer recreational and aesthetic injuries if timber sales are delayed or reduced. In addition to these harms, Petitioners' briefs and oral arguments allege two "procedural" injuries. First, Petitioners claim they were injured by the Forest Service's alleged failure to comply with NEPA. Second, Petitioners claim a procedural injury because the Forest Service enacted the temporary suspension of road construction through informal rulemaking under the Administrative Procedures Act ("APA") rather than though the forest planning process of NFMA.

Petitioners attempt to demonstrate their members' injuries primarily though declarations of representatives of WTIA member companies which were filed as appendices to Petitioners' Reply Brief. Six of the declarants, Gary M. Erickson, David F. Slater, John T. Quinn, Charles L. Wright, Lawrence J. Peterson, and Keith E. Harding, presently work in the timber industry for various WTIA member companies that rely, at least in part, on timber harvested from National Forests within Wyoming for their operations. (*See* Erickson decl.; Slater decl.; Quinn decl.; Wright decl.; Peterson decl.; Harding decl.) Each of these declarants asserts that the Rule resulted in delays or reductions in timber sales which caused economic hardship to the sawmill companies. (*See id.*)

In particular, the declarants point to the Tie Camp Timber Sale as an example of the reduction in timber offered for sale as a result of the Rule. In an April 7, 1999 Record of Decision by Jerry E. Schmidt, Forest Supervisor of Medicine Bow/Routt National Forests (included as an attachment to David Slater's declaration) Mr. Schmidt decided to offer for sale only that portion of a previously defined harvest area "which is not affected by the National Road Rule suspension." Petitioners also provided a March 10, 1999 document, included as an exhibit to Charles Wright's

declaration, originating from the Wind River Ranger District of the Shoshone National Forest, describing the effects of the Rule on a proposed Double Cabin Timber Sale. The document indicates that, because certain portions of the Double Cabin Timber Sale could not be accessed under the Rule, the entire sale was delayed pending expiration of the eighteen month road construction moratorium. Finally, Petitioners supply, as an attachment to Keith Harding's declaration, a letter from Craig Yancey, District Ranger for the Tongue Ranger District of the Bighorn National Forest. The letter indicates that a proposed South Babione Timber Sale was canceled in anticipation of the road construction moratorium.

Each of these declarants also claim a stake in forest management based on the declarant's personal recreational use of the National Forests. (*See* Erickson decl.; Slater decl.; Quinn decl.; Wright decl.; Peterson decl.; Harding decl.) Several declarants contend that their recreational opportunities will be harmed because delays or reductions in timber harvesting will cause poor forest health and catastrophic forest fires. (*See* Slater decl.; Quinn decl.; Wright decl.; Peterson decl.; Harding decl.)

### 1. Organizational Standing

Prior to deciding whether the injuries identified in the declarations supplied by Petitioners are sufficient to establish standing, it is necessary to determine which types of injuries the Petitioners, the actual parties in this lawsuit, are competent to raise. Petitioners, Wyoming Timber Industry Association and Frontiers of Freedom–Wyoming, do not appear to contend that they, as associations, were injured by the Rule. Rather, Petitioners seek to establish "organizational" standing under which they would raise the legal rights and interests of their members. Of course, Petitioners then run up against the prudential prohibition against litigating the legal rights of third parties. *See Warth*, 422 U.S. at 499, 95 S.Ct. 2197. There is, however, an exception to this general prohibition: "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In this case, the injuries raised by Petitioners fall into two general categories: recreational or aesthetic injuries and economic injuries.

#### a. Recreational and Aesthetic Injuries

The actual members of WTIA are the timber companies themselves, not the employees of the member companies. (*See* First Am.Compl. ¶ 2.) While the declarants may have deeply-held concerns for the aesthetic and recreational values of the National Forests, these are personal to the employees. The timber companies, as corporate entities, cannot hunt, fish, or participate in wildlife photography. Consequently, the actual members of WTIA, the timber companies, suffered no recreational or aesthetic injuries, and the declarants' injuries do not provide a basis for WTIA's standing.

Even if the recreational and aesthetic injures were attributed to WTIA's members, neither WTIA nor Frontiers of Freedom–Wyoming have made the required showing that these interests are germane to WTIA's organizational purpose. *See United Food & Commercial Workers Union Local 751 v. Brown Group*, 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). The "germaneness" requirement "raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *Id.* at 555–56, 116 S.Ct. 1529. Quite simply, WTIA has not demonstrated that recreation and aesthetic issues are germane to its organizational

purpose, nor is it the "natural adversary" of the Forest Service when acting as an advocate for recreation and aesthetic concerns. See *Pacific Northwest Generating Coop. v. Brown,* 38 F.3d 1058, 1063 (9th Cir.1994) (holding that large purchasers of hydropower lacked organizational standing to raise the aesthetic and recreational interests of their customers as such interests were not germane to their own purposes). Thus, the recreational interests of the employees of WTIA's members does not meet the injury in fact requirement to establish WTIA's standing.

Neither can Frontiers of Freedom–Wyoming meet *Hunt's* organizational standing requirements for recreational or aesthetic injuries. Frontiers of Freedom–Wyoming makes no attempt to allege that recreational and aesthetic injuries are a significant part of its organizational purpose. (Pet'nrs' First Am.Compl. ¶ 4.)

**b. Economic Injuries**

Through the declarations of representatives of WTIA member companies, Petitioners claim harm to the economic interest of the timber companies resulting from timber sale delays and reductions caused by the Rule. Championing the economic interests of the Wyoming timber industry is obviously part and parcel of WTIA's organizational purpose. Thus, WTIA meets *Hunt's* "germaneness" element with respect to economic injuries suffered by WTIA members.[2] Moreover, the third *Hunt* element is satisfied because this petition for review does not require individual participation by the timber companies. *See Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. The last hurdle to WTIA's standing is the first *Hunt* element. WTIA has standing only if the individual timber companies would have standing to bring the suit in their own right. This requires at least one WTIA member to satisfy the Article III standing requirements of injury, causation, and redressability. *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130.

**2. Individual Standing of the WTIA Member Timber Companies**

**a. Injury in Fact**

■ The issue now turns to whether economic harm resulting from the timber sale reductions or delays is a sufficient basis for Article III standing. This Court has held that economic injury to timber interests resulting from reduced timber volumes offered for sale by the Forest Service is not the type of injury that confers standing. *See Wind River Multiple Use Advocates v. Espy,* 835 F.Supp. 1362, 1369 (D.Wyo.1993). In *Wind River,* this Court held the petitioner lacked standing to challenge a forest plan for failing to provide adequate output of timber and minerals. *Id.* The petitioner had no " 'legally-protected interest' " because "no statute or regulation confers the right to harvest timber in the forest." *Id.* (quoting *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130). The Eleventh Circuit reached the same conclusion, holding that a reduction in the amount of timber available for future timber sale contracts was not a sufficient injury to confer standing upon timber companies because they "have no right to compel the Forest Service to sell any future timber to them." *Region 8 Forest Serv. Timber Purchasers v. Alcock,* 993 F.2d 800, 808 (11th Cir.1993). The Court is now persuaded, however, by the reasoning of the courts that have recently found that timber companies can satisfy the injury in fact requirement by showing reductions in timber output. *See Mountain States,* 92 F.3d at 1233; *California Forestry Ass'n v. Thomas,* 936 F.Supp. 13, 17 (D.D.C.1996). The Court agrees with *Mountain States'* observation that, while it is difficult to ascertain what *Defenders of Wildlife* meant by the term "legally-pro-

---

2. Because the Court need only assure itself of the standing of one petitioner, *Mountain States Legal Found. v. Glickman,* 92 F.3d 1228, 1232 (D.C.Cir.1996), the Court need not determine whether the timber companies' economic interests are germane to Frontiers of Freedom–Wyoming's organizational purpose.

tected interest," it certainly did not intend to return to the "legal interest" test for standing. *See Mountain States,* 92 F.3d at 1233. Modern standing doctrine seeks to separate the standing inquiry from the merits, and the "legal interest" test goes to the merits and is not a part of standing. *See Data Processing,* 397 U.S. at 153, 90 S.Ct. 827. Consequently, in accordance with this more fact-based approach, the Court finds that WTIA's members suffered an injury in fact sufficient to meet Article III requirements as a result of reductions or delays in timber sales, even if the companies had no legal right to harvest timber on National Forest lands. *See Ash Creek Mining Co. v. Lujan,* 969 F.2d 868, 875 (10th Cir.1992) (noting that "courts generally will find injury in fact if the plaintiff can demonstrate a plausible benefit").

**b. Causation**

Next, Petitioners must show that the lost timber opportunities are "fairly traceable" to the Forest Service's implementation of the Rule. *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. Whether the Rule caused the timber sale reductions is subject to question, however, because, even in the absence of the Rule, the Forest Service could have exercised its discretion to refrain from offering the Tie Camp, Double Cabin, South Babione, or any other timber stand for sale. The question, then, is whether such agency discretion destroys Article III causation.

The Supreme Court confronted a similar issue in *Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). In *Bennett,* ranchers and irrigation districts challenged a biological opinion issued by the Fish and Wildlife Service pursuant to the Endangered Species Act ("ESA"). 520 U.S. at 157, 117 S.Ct. 1154. The petitioners were water users of a water reclamation project administered by the Bureau of Reclamation. *Id.* The Fish and Wildlife Service's biological opinion recommended to the Bureau of Reclamation that, in order to avoid jeopardy to certain endangered fish, a "reasonable and prudent al-

ternative" was to maintain minimum water levels in certain reservoirs, causing, in the aggregate, a reduction in the water available for use by the petitioners and others. *Id.* at 159–60, 117 S.Ct. 1154. The government argued that causation was lacking because any reduction in water allocated to petitioners resulted, not from the biological opinion, but by the independent decision of the Bureau of Reclamation, an entity that was not a party to the lawsuit and that was not legally bound to follow the biological opinion. *Id.* at 168–69, 117 S.Ct. 1154. The Supreme Court disagreed.

> [The government's argument] wrongly equates injury "fairly traceable" to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation. While, as we have said, it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the actions of someone else.

*Id.* (internal quotations and citations omitted) (further noting the near certainty that agency officials will follow the Fish and Wildlife Service's biological opinions). To an even greater degree than the biological opinion at issue in *Bennett,* the Rule guaranteed that certain timber stands within the National Forest System would not be offered for sale, and thus had a "determinative effect" leading to the timber companies' claimed injury, even if the Forest Service retained discretion to decline to make such timber sales on other grounds. *See id.* at 169, 117 S.Ct. 1154.

■ The Supreme Court most recently examined the impact of agency discretion on the "fairly traceable" standing element in *Federal Election Commission v. Akins,* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). *Akins* concerned a challenge by a group of voters to the Federal Election Commission's ("FEC's") decision not to pursue an enforcement action against the American Israel Public Affairs Com-

mittee ("AIPAC"). 525 U.S. at 13–18, 119 S.Ct. 313. Under the Federal Election Campaign Act, organizations meeting the statutory definition of a "political committee" must disclose certain information to the FEC, which then makes the information public. *Id.* The voters claimed injury because they were unable to obtain information about AIPAC, and sought judicial review of the FEC's determination that AIPAC was not a "political committee." *Id.* at 21, 119 S.Ct. 313. The Supreme Court found that this informational injury was "fairly traceable" to the FEC's decision that AIPAC was not a "political committee." *Id.* at 25, 119 S.Ct. 313.

> Of course, as the FEC points out, it is possible that even had the FEC agreed with [the voters'] view of the law, it would still have decided in the exercise of its discretion not to require AIPAC to produce the information. But that fact does not destroy Article III "causation," for we cannot know that the FEC would have exercised its prosecutorial discretion in this way. Agencies often have discretion about whether or not to take a particular action. Yet those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason. Thus, [the voters'] "injury in fact" is "fairly traceable" to the FEC's decision not to issue its complaint, even though the FEC might reach the same result exercising its discretionary powers lawfully.

*Id.* (internal citations omitted). In light of *Akins,* the Forest Service's discretion to halt timber sales for reasons wholly independent of the Rule cannot "destroy Article III 'causation.'" *Id.*

### c. Redressability

Finally, Petitioners must show that it is likely that the timber companies' injuries would be redressed by a favorable decision. *See Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. Respondents forcefully argue that Petitioners lack standing because the timber companies' injuries are not redressable by a favorable decision. (Federal Resp.Br. at 15–18.) Respondents correctly point out that, even in the absence of the Rule, the Forest Service is under no general obligation to offer timber for sale during the road suspension period, nor did it have any duty to offer timber sale contracts to any one of WTIA members. (*Id.* at 17.) Implicitly, then, Respondents argue that this Court could neither order the Forest Service to offer timber for sale, nor could it order a sale to any particular timber company.

Traditionally, the Supreme Court has strictly and vigorously enforced this "redressability" standing requirement. In *Linda R.S. v. Richard D.,* for example, a woman sought to have the father of her child prosecuted for failure to pay child support. 410 U.S. 614, 614–16, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). The lawsuit was dismissed for lack of standing. The Court observed that "if appellant were granted the requested relief, it would result only in the jailing of the child's father. The prospect that prosecution will . . . result in payment of support can, at best, be termed only speculative." *Id.* at 618, 93 S.Ct. 1146. The strict application of the "redressability" requirement is further exemplified by *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 45–46, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). There, the plaintiffs challenged an Internal Revenue Service Revenue Ruling requiring tax-exempt hospitals to provide indigent patients with medical care only in emergencies, whereas hospitals previously had to provide indigents with a wider array of health care services to obtain favorable tax treatment. *Id.* at 28, 96 S.Ct. 1917. The plaintiffs, who claimed they

were denied medical care because of the new Revenue Ruling, were denied standing because it was purely speculative whether vacating the Revenue Ruling would lead to increased health care access for the indigent, or whether hospitals would continue to deny care to indigents and forego the tax benefits. *Id.* at 43, 96 S.Ct. 1917.

Following the Supreme Court's lead, the Tenth Circuit has stringently applied the redressability requirement. For example, in *Ash Creek Mining Co. v. Lujan,* standing was denied to a mining company seeking to challenge an exchange of a conservation easement for coal owned by the Department of Interior lying adjacent to a mine operated by the mining company. 969 F.2d 868, 876 (10th Cir.1992). The mining company's lost opportunity to participate in the competitive leasing for the right to extract the coal was not a redressable injury because the court lacked the power to order competitive leasing of the coal. *Ash Creek,* 969 F.2d at 874. Similarly, an operator of a concession facility within a National Forest lacked standing to challenge the government's decision not to rebuild the facility after a fire. *See Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1451 (10th Cir.1994). The company's injuries were not redressable because, even if the concession facility was rebuilt, there was no guarantee that the company would be awarded the concession contract, nor could the court order such relief. *Id.* A parallel result was reached in *Baca v. King,* 92 F.3d 1031 (10th Cir.1996), where a rancher challenged a land exchange involving federal lands that his family had grazed pursuant to a federal grazing permit for half a century. The Tenth Circuit held he lacked standing, however, stating that "only the renewal of Mr. Baca's grazing permit or the sale of the land to him would likely redress his claimed injuries. Such relief is beyond our authority to give." *Baca,* 92 F.3d at 1037.

■ The Court has little choice but to agree with Respondents that, under *Ash Creek, Mount Evans,* and *Baca,* the tim-

ber companies' economic injuries are not redressable for Article III standing purposes. Were the Court to grant the remedy sought by Petitioners and enjoin enforcement of the Rule in Wyoming, it is purely speculative whether the Forest Service would make additional timber offerings or whether any of WTIA's members would succeed in obtaining additional timber contracts.

**d. Procedural Injuries as a Basis for Standing**

If economic harm to the timber companies was the only injury identified by Petitioners, the standing inquiry would be complete. In addition to the economic injuries, however, Petitioners claim that the timber companies suffered a procedural injury as a result of the Forest Service's implementation of the temporary road moratorium without modifying forest plans through NFMA's forest planning procedures. Petitioners also claim injury from the Forest Service's failure to prepare an Environmental Impact Statement pursuant to NEPA.

Under certain circumstances, such procedural injuries can serve as a basis for Article III standing. Procedural injury standing developed from *Defenders of Wildlife,* where citizens claimed a procedural injury from the Secretary's failure to follow interagency consultive procedures regarding the impacts on endangered species of certain overseas development projects. 504 U.S. at 571–72, 112 S.Ct. 2130. While *Defenders of Wildlife* denied standing, the opinion revealed the roadmap for future plaintiffs attempting to achieve standing based on procedural injuries. Justice Scalia explained that

[t]here is much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a

federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.... What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

*Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.

The lower courts have relied upon *Defenders of Wildlife* to confer standing based on procedural injuries. In *Committee to Save the Rio Hondo v. Lucero*, for example, the Tenth Circuit found that the Forest Service's failure to prepare an Environmental Impact Statement prior to allowing summer use of a ski resort area was a procedural injury that provided standing to citizens who used land and water affected by the increase in use by the ski area. 102 F.3d 445, 447–52 (10th Cir.1996). *Rio Hondo* explained that a plaintiff alleging a NEPA violation can satisfy the injury in fact element by showing only that the violation caused an increased risk of environmental harm, and that "the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action." *Id.* at 449. Such injuries are redressable because a favorable decision "would avert the possibility that the Forest Service may have overlooked significant environmental consequences of its action." Id. at 452. That the Forest Service may take the same action after complying with NEPA was "immaterial" for redressability purposes. *Id.*

The Tenth Circuit again accepted a procedural injury as the basis for standing in

*Utah v. Babbitt*, 137 F.3d 1193 (10th Cir. 1998). There, the plaintiffs asserted that the Bureau of Land Management ("BLM") was managing certain lands in a de facto wilderness area, an action which, according to the plaintiffs, required the BLM to formally amend the land use plan under procedures specified in Federal Land Management Policy and Management Act ("FLMPA"). The plaintiffs asserted that the de facto wilderness management status impaired their ability to lease their adjacent lands and that they were denied the opportunity to participate in the FLMPA planning process. *Id.* at 1215. After observing that "courts have recognized that an individual may enforce procedural rights 'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing,'" the Tenth Circuit held that violation of the plaintiffs' procedural rights under FLMPA was a redressable injury furnishing the basis for Article III standing. *Id.* at 1215–16 (quoting *Defenders of Wildlife*, 504 U.S. at 573 n. 8, 112 S.Ct. 2130).

The Tenth Circuit's modified treatment of the redressability requirement in the procedural injury context finds support in *Akins*, which squarely faced the circumstance where pervasive agency discretion dispelled any confidence that removal of the complained-of agency action would remedy the injury in fact that served as the basis for standing. As discussed *supra*, *Akins* held that voters had standing to challenge the FEC's conclusion that AIPAC was not a "political committee" even though reversal of the FEC's conclusion would not guarantee the voters would receive the information they sought because the FEC retained discretion not to pursue an enforcement action against AIPAC. 524 U.S. at 25, 118 S.Ct. 1777. After *Akins'* discussion of causation, quoted in its entirety *supra*, the Supreme Court simply observed that, "[f]or similar reasons, the courts in this case can 'redress' [the voters'] 'injury in fact.'" *Id.*[3]

---

**3.** Interestingly, *Akins* made no reference to the procedural injury discussion in *Defenders*  *of Wildlife,* nor did *Akins* even identify the

**1258**

■ To regain our bearings, under *Rio Hondo* and *Utah v. Babbitt*, and certainly after *Akins*, the fact that this Court cannot fashion a remedy creating a substantial likelihood that the Forest Service will offer additional timber for sale does not, by itself, deprive Petitioners of standing. To establish standing, however, Petitioner must prove that: (1) the timber companies possessed a procedural right, and (2) the procedural right was designed to protect the timber companies' concrete interest that served as the basis for their standing, that is, their interest in timber harvesting within Wyoming's National Forests. *See Defenders of Wildlife*, 504 U.S. at 573 n. 8, 112 S.Ct. 2130; *Utah v. Babbitt*, 137 F.3d at 1215–16. Petitioners claim injury to procedural rights provided by NFMA and NEPA.

### (i) Procedural Injuries Under NFMA

The timber companies certainly have a concrete interest in timber output from National Forests within Wyoming. More troubling, however, is whether Petitioners actually had a procedural right to participate in NFMA planning procedures as a prerequisite to the Forest Service's implementation of a temporary road construction moratorium. If the timber companies had no such procedural right, they suffered no procedural injury and have no standing to sue. *See Utah v. Babbitt*, 137 F.3d at 1214 (NEPA violation could not serve as the basis for procedural-injury standing where the petitioners' argument that an EIS should have been prepared was legally meritless).[4]

To be sure, NFMA gives timber interests procedural rights in the formulation of land and resource management plans to protect their economic interests. NFMA recognizes economic uses including timber harvesting as uses to be considered in developing land resource management plans ("LRMP's"). *See* 16 U.S.C.A. § 1604(b), (e). Opportunities for public participation in LRMP preparation are specifically guaranteed by NFMA. *Id.* § 1604(d). Moreover, regulations promulgated pursuant to NFMA provide detailed public participation procedures and requirements, *see* 36 C.F.R. § 219.6 (1999), thereby providing procedural rights to interested parties such as the timber companies.

Respondents contend, however, that the Forest Service could enact the road moratorium by rule, thereby obviating the need to proceed under NFMA's forest planning procedures. (Federal Resp.Br. at 34–36.) Since the Organic Act of 1897, the Forest Service has possessed broad rulemaking authority for management of the National Forests. The Organic Act provides:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests . . . and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction. . . .

case as a "procedural rights" case. Perhaps *Akins* can best be understood to more broadly redefine the standing analysis for all challenges to discretionary agency action. In the administrative law context, the injury must be defined with reference to the statutory right at issue, and cannot be understood as an exclusively factual question. *See* Cass R. Sunstein, *Informational Regulation & Informational Standing: Akins & Beyond*, 147 U.Pa.L.Rev. 613, 648–51 (1999). After *Akins*, then, it is not so much that there is a relaxed redressability standard for "procedural rights" cases, but rather that the Supreme Court has more cleanly recognized that congressionally creat-

ed rights can serve as redressable injuries in fact. *See id.*

4. Determining whether the timber companies suffered an injury to their procedural rights under NFMA necessarily involves a legal (rather than factual) inquiry which delves, to some degree, into the merits of Petitioners' legal arguments. While this may appear at odds with the desired separation between standing and the merits, *see Data Processing*, 397 U.S. at 153, 90 S.Ct. 827, such is the unavoidable consequence of premising standing on injuries to statutory rights.

16 U.S.C.A. § 551 (West 1985). Section 551 evinces a Congressional intent to delegate broad authority to the Secretary for management of the National Forests. *See Mountain States Tel. & Tel. Co. v. United States,* 204 Ct.Cl. 521, 499 F.2d 611, 613–14 (1974); *United States v. Hymans,* 463 F.2d 615, 617 (10th Cir.1972) ("As long as such rules and regulations tend to protect the lands and faithfully preserve the interest of the people of the whole country in the lands, the courts should enforce such rules and regulations.") Courts have upheld regulations issued under § 551 in a wide variety of contexts. *See Hymans,* 463 F.2d at 617 (Secretary had authority under § 551 to prohibit indecent conduct within National Forests); *McMichael v. United States,* 355 F.2d 283, 284–86 (9th Cir.1965) (upholding regulatory prohibition on motorized vehicles within primitive National Forest areas); *Elko County Board of Supervisors v. Glickman,* 909 F.Supp. 759, 763–64 (D.Nev.1995) (holding that ranchers with vested water rights and accompanying rights-of-way across National Forest land were still subject to regulation under rules promulgated under § 551 authority). Respondents also point to the Forest Service's rulemaking authority granted by NFMA. *See* 16 U.S.C.A. § 1604(g) (granting the Secretary rulemaking authority over LRMP development and revision procedures); 16 U.S.C.A. § 1613 ("The Secretary of Agriculture shall prescribe such regulations as he determines necessary and desirable to carry out the provisions of this subchapter.") Further, the Secretary has authority to "issue such regulations as he deems advisable" to carry out his responsibilities for construction and maintenance of forest development roads and trails. *See* 23 U.S.C.A. § 205 (West 1990). Moreover, the Forest Service could use its rulemaking authority to resolve issues of broad applicability even though it had a concurrent duty to engage in more localized decision making through NFMA's forest planning process. *See American Hospital Ass'n v. NLRB,* 499 U.S. 606, 612, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991)

("[E]ven if a statutory scheme requires individualized determinations, the decision-maker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority.")

In Petitioners' view, however, the Secretary's broad rulemaking authority is curtailed by the WWA. Petitioners specifically cite the WWA's provision that released lands "shall be managed for multiple use in accordance with land management plans pursuant to section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974 as amended by the National Forest Management Act of 1976." Pub.L. No. 98–550, § 401(b)(3), 98 Stat. 2813. Petitioners argue that under § 401(b)(3), the only way that the Forest Service can make a decision affecting released lands in Wyoming is through NFMA's forest planning process. (Pet'nrs' Reply Br. at 16–17.) While Petitioners' position has superficial appeal, closer analysis reveals that Petitioners' interpretation of the WWA is untenable. First, Petitioners' reading creates an inconsistency between § 401(b)(3) and the stated purpose of the WWA, which was to "insure that certain National Forest System lands in the State of Wyoming be made available for uses other than wilderness in accordance with applicable national forest laws and planning procedures and the provisions of this Act." Pub.L. No. 98–550, § 102(b)(2), 98 Stat. 2807. Section 102(b)(2) clearly contemplates that the released lands would be managed according to the entire forest management legal framework, which necessarily includes the Organic Act and the Secretary's corresponding rulemaking authority. The two sections can be read harmoniously, however, only if § 401(b)(3) is interpreted, not as a restriction on the Forest Service's rulemaking authority, but instead as a reaffirmation of the Forest Service's ability to manage the released lands under the existing multiple use planning framework guided most explicitly, but not exclusively, by 16 U.S.C. § 1604.

■ Further, the absence of any mention of the Forest Service's rulemaking authority in the statute or legislative history belies Petitioners' assertion that the WWA was intended as a restraint on that authority. *See American Hospital*, 499 U.S. at 613, 111 S.Ct. 1539 ("As a matter of statutory drafting, if Congress had intended to curtail in a particular area the broad rulemaking authority granted in [another statutory section], we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section.") As a matter of statutory construction, the Court concludes that the WWA does not extinguish the Secretary's authority to promulgate rules which may affect land released for multiple use under the WWA. Because the Court agrees that the Forest Service had the right to proceed via rulemaking in lieu of forest plan modification, the timber companies' claimed procedural injury is to a non-existent right and cannot suffice as grounds for standing. *See Utah v. Babbitt*, 137 F.3d at 1214.

### (ii) Procedural Injuries Under NEPA

■ Many courts have found that injuries to procedural rights bestowed by NEPA can serve as the basis for standing for those seeking to vindicate environmental and aesthetic interests. *See, e.g., Rio Hondo*, 102 F.3d at 448–451. As discussed *supra*, however, Petitioners have organizational standing only to raise the economic interests of the timber companies. Petitioners can challenge the Forest Service's compliance with NEPA only if they can satisfy the prudential requirement that the timber companies' economic interests are "arguably within the zone of interests to

be protected or regulated" by NEPA. *Data Processing*, 397 U.S. at 153, 90 S.Ct. 827. In fact, courts have consistently held that economic interests are not within the zone of interests protected by NEPA. *See Western Radio Serv. Co. v. Espy*, 79 F.3d 896, 903 (9th Cir.1996); *Nevada Land Action Ass'n v. United States Forest Service*, 8 F.3d 713, 716 (9th Cir.1993); *Wyoming Farm Bureau Fed'n v. Babbitt*, 987 F.Supp. 1349 (D.Wyo.1997). In *Nevada Land Action*, a group of ranchers seeking increased grazing levels on National Forest land lacked standing to bring a claim that the Forest Service violated NEPA in adopting a Land and Resource Management Plan. 8 F.3d at 715. The ranchers' interests were primarily economic, and their claim that the forest plan caused a "lifestyle loss" could not bring the claim within NEPA's zone of interest because substantial evidence indicated that increased grazing would not benefit the natural environment. *Id.* Ranchers' economic and human safety concerns over introduction of an experimental wolf population on National Park and National Forest lands were likewise held to be outside the zone of interest of NEPA. *See Wyoming Farm Bureau*, 987 F.Supp. at 1362. Similarly, the timber companies' economic interest in increased timber harvesting do not fall within the zone of interests to be protected or regulated by NEPA.[5] Therefore, Petitioners do not have standing to challenge the Forest Service's Finding of No Significant Impact.

### Conclusion

Petitioners lack standing to bring this action. The economic injuries suffered by the timber companies as a result of the

5. Any attempt by Petitioners to penetrate into NEPA's zone of interest under the mantle of the timber companies' concrete interest in forest health would likewise fail (nowhere do Petitioners clearly make such an argument). Because the plaintiff's interests must be " 'systematically, not fortuitously' or 'accidentally' aligned with those that 'Congress sought to protect,' " a timber company's interest in forest health falls outside NEPA's zone of interest. *California Forestry*, 936 F.Supp. at 22 (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 924–25 (D.C.Cir. 1989)); *see also Trinity County Concerned Citizens v. Babbitt*, No. 92–1194, 1993 WL 650393, at *6 (D.D.C. Sept. 20, 1993) (observing that forest health injuries asserted by logging interests are "no more than economic injury in disguise").

Rule are not redressable by a favorable ruling of this Court. Petitioners' claimed injury resulting from the Forest Service's failure to engage in NFMA forest planning was no injury at all because the Forest Service had legal authority to adopt the road moratorium in accordance with APA informal rulemaking procedures. Finally, Petitioners cannot bring a claim asserting NEPA violations because the timber companies' economic interests do not fall within the zone of interests protected by NEPA. Consequently, Petitioners' petition for review is **DISMISSED WITH PREJUDICE** for lack of jurisdiction.